**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SIERRA CLUB; CENTER FOR
BIOLOGICAL DIVERSITY;
GREENACTION FOR HEALTH AND
ENVIRONMENTAL JUSTICE,
                              *Petitioners*,

                 v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; LISA P. JACKSON, in her
official capacity as Administrator,
U.S. Environmental Protection
Agency; GINA MCCARTHY, in her
official capacity as Assistant
Administrator, Office of Air and
Radiation, U.S. Environmental
Protection Agency,
                              *Respondents*,

AVENAL POWER CENTER,
                 *Respondent-Intervenor*.

No. 11-73342

EL PUEBLO PARA EL AIRE Y AGUA
LIMPIO,
                    *Petitioner*,

            v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; LISA P. JACKSON, in her
official capacity as Administrator of
the USEPA; JARED BLUMENFELD, in
his official capacity as Regional
Administrator for Region IX of the
USEPS,
                    *Respondents*,

AVENAL POWER CENTER,
            *Respondent-Intervenor*.

No. 11-73356

OPINION

On Petition for Review of an Order of the
United States Environmental Protection Agency

Argued and Submitted
October 8, 2013—San Francisco, California

Filed August 12, 2014

Before: N. Randy Smith and Jacqueline H. Nguyen, Circuit
Judges, and Gordon J. Quist, Senior District Judge.*

Opinion by Judge Nguyen

---

* The Honorable Gordon J. Quist, Senior District Judge for the U.S.
District Court for the Western District of Michigan, sitting by designation.

## SUMMARY[**]

### Environmental Law

The panel granted a petition for review brought by environmental groups, and vacated the Environmental Protection Agency's decision to issue a Prevention of Significant Deterioration Permit, allowing Avenal Power Center LLC to build and operate the Avenal Energy Project, a 600 megawatt natural gas-fired power plant, under the old air quality standards.

The panel held that petitioners had standing because a number of the petitioners had associational standing to challenge EPA's action. Turning to the merits, the panel held that the EPA exceeded its authority under the Clean Air Act. The panel applied *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), analysis, and held that the Clean Air Act unambiguously required Avenal Power to demonstrate that the Avenal Energy Project complied with the regulations in effect at the time the Permit was issued. The panel further held that because Congress had directly spoken on the issue, the EPA could not waive this requirement. The panel remanded for further proceedings.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# COUNSEL

Paul R. Cort (argued) and George Torgun, Earthjustice, Oakland, California, for Petitioners Sierra Club, Center for Biological Diversity, and Greenaction for Health and Environmental Justice.

Ingrid Brostrom and Brent Newell, Center on Race, Poverty & the Environment, San Francisco, California, for Petitioner El Pueblo Para El Aire y Agua Limpio.

Ignacia S. Moreno, Assistant Attorney General, and Stephanie J. Talbert (argued), United States Department of Justice, Environment & Natural Resources Division, Washington, D.C.; Brian Doster, David Coursen, Melina Williams, and Julia Walters, United States Environmental Protection Agency, for Respondents.

William R. Warne (argued), Jane E. Luckhardt, Elizabeth B. Stallard, Gregory T. Broderick, and Nicholas Rabinowitch, Downey Brand LLP, Sacramento, California, for Respondent-Intervenor.

John J. Davis, Jr. and Andrew J. Kahn, Davis, Cowell & Bowe, LLP, San Francisco, California, for Amici Curiae Avenal-Area Unions.

**OPINION**

NGUYEN, Circuit Judge:

Avenal Power Center LLC ("Avenal Power") applied to the United States Environmental Protection Agency ("EPA") for a Prevention of Significant Deterioration Permit ("Permit"), to build and operate the Avenal Energy Project, a 600 megawatt natural gas-fired power plant in the city of Avenal, California. Although EPA had a statutory duty under the Clean Air Act to either grant or deny the Permit application within one year, 42 U.S.C. § 7475(c), it failed to do so. After the deadline passed but before taking any final action, EPA tightened the applicable air quality standards. Avenal Power filed suit and sought to compel EPA to issue the Permit under the old standards that would have applied had EPA acted within the statutory deadline. Initially, EPA responded that it could not legally do so, because the Clean Air Act explicitly requires any newly constructed facility to employ the best available control technology ("BACT") for regulated pollutants and meet air quality standards in effect at the time a permit is issued. *See* 42 U.S.C. § 7475(a)(3)–(4). Months later, however, EPA reversed course and granted Avenal Power the Permit without regard to the new regulations, which by then had gone into effect. EPA contends that, under narrow circumstances, it has the authority to grandfather certain permit applications like Avenal Power's, and that its decision is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). The Sierra Club, Greenaction for Health and Environmental Justice, Center for Biological Diversity, and El Pueblo para el Aire y Agua Limpio (collectively "Petitioners"), challenge EPA's action.

Applying *Chevron*, we hold that the Clean Air Act unambiguously requires Avenal Power to demonstrate that the Avenal Energy Project complies with the regulations in effect at the time the Permit is issued. Because "Congress has directly spoken to the precise question at issue," *Chevron*, 467 U.S. at 842, EPA cannot waive this requirement. We therefore GRANT the Petition for review, VACATE the decision to issue the Permit, and REMAND for proceedings consistent with this opinion.

## BACKGROUND

Avenal Power proposes to build and operate a power plant, the Avenal Energy Project, near the agricultural communities of Avenal, Huron, and Kettleman City, within California's San Joaquin Valley Pollution Control District. The facility would generate electricity from two 180-megawatt natural gas combustion turbine generators, and a 300-megawatt steam turbine generator that utilizes heat from the combustion turbines. According to EPA, the facility "will be equipped with state-of-the-art control technology and will be one of the lowest emitting power plants of its kind." It is undisputed, however, that its expected emissions of several pollutants, including nitrogen dioxide ("$NO_2$"), carbon dioxide ("$CO_2$"), and sulfur dioxide ("$SO_2$"), are sufficient to subject it to regulation under the Clean Air Act.

On February 15, 2008, Avenal Power submitted an application to EPA for a Permit. The Regional Administrator determined the application to be administratively complete on March 19, 2008. As of that date, EPA had not yet promulgated national ambient air quality standards ("NAAQS") for $NO_2$ or $SO_2$ emissions, or BACT requirements for greenhouse gases, including $CO_2$. NAAQS,

which are regularly reviewed and revised by the EPA Administrator, set hourly limits on the emission of designated pollutants. *See* 42 U.S.C. §§ 7409, 7409(d)(1); 40 C.F.R. § 52.21(b)(50). The BACT requirement consists of "an emission limitation based on the maximum degree of reduction of each [regulated] pollutant" that EPA determines is achievable "through application of production processes and available methods, systems, and techniques" in view of "energy, environmental, and economic impacts and other costs." 42 U.S.C. § 7479(3).

On June 16, 2009, after the one-year decision making period had elapsed, *see* 42 U.S.C. § 7475(c), the Regional Administrator finally issued a Statement of Basis describing the reasons for the proposed approval of the Permit. The Statement of Basis is subject to notice and comment procedures that afford the public an opportunity to participate in the review process by submitting written comments and appearing at a hearing to voice support or concern. *See* 42 U.S.C. § 7475(a)(2); 40 C.F.R. §§ 124.10–12. During the comment period in this case, EPA held an informational meeting and two hearings. Concerned that the Avenal Energy Project would adversely impact the environment and health and quality of life of local residents, Petitioners filed comments opposing issuance of the Permit.

While Avenal Power's Permit application was still under consideration, EPA adopted more stringent NAAQS and revised the BACT requirement. Specifically, EPA tightened NAAQS for $NO_2$, capping hourly emissions at 100 parts per billion ("ppb"), with the new regulations to take effect on April 12, 2010. *See* Primary National Ambient Air Quality Standards for Nitrogen Dioxide, 75 Fed. Reg. 6,474, 6,475 (Feb. 9, 2010). EPA further subjected greenhouse gases such

as $CO_2$ to BACT requirements, effective January 2, 2011. *See* Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs, 75 Fed. Reg. 17,004 (Apr. 2, 2010).  Finally, EPA published a final rule establishing a new hourly $SO_2$ NAAQS of 75 ppb, to become effective August 23, 2010.  *See* Primary National Ambient Air Quality Standards for Sulfur Dixoide, 75 Fed. Reg. 35,520 (June 22, 2010).

Facing a slew of new regulations, and frustrated by the delay, Avenal Power filed suit on March 9, 2010, in the United States District Court for the District of Columbia, to compel EPA to issue the Permit.  Two months later, EPA requested that Avenal Power complete a cumulative air impact assessment of the Avenal Energy Project's hourly $NO_2$ emissions to address its compliance with the revised NAAQS.  Although Avenal Power cooperated and submitted additional documentation, the process took months.

In late August 2010, after the new $NO_2$ and $SO_2$ NAAQS had gone into effect, Avenal Power requested an expedited judgment on the pleadings from the D.C. district court in an effort to compel EPA to issue the Permit without consideration of the newly effective regulations.   EPA opposed the motion, arguing that even though it missed the one-year statutory deadline to act on Avenal Power's application, the Clean Air Act prohibits the agency from granting the Permit unless Avenal Power complies with the superseding standards.  In support of its position, EPA cited public guidance issued by the Director of its Office of Air Quality Planning and Standards.[1]  *See* Memorandum from

---

[1] We take judicial notice of this document as a public record.  Fed. R. Evid. 201; *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

Stephen D. Page, EPA Office of Air Quality Planning and Standards, Applicability of the Federal Prevention of Significant Deterioration Permit Requirements to New and Revised National Ambient Air Quality Standards (Apr. 1, 2010) (hereinafter "Page Memo"), *available at* http://www.epa.gov/region7/air/nsr/nsrmemos/psdnaaqs.pdf. EPA also promised the district court it would issue a final decision by December 31, 2010—that is, before the revised regulations on greenhouse gases went into effect on January 2, 2011. It eventually became clear, however, that a final decision would not be forthcoming by that date, further forestalling administrative proceedings.[2] And sure enough, the deadline passed without a final decision.

At this point, after conducting what it described as a "policy review," EPA reversed course. In a declaration submitted to the D.C. district court, EPA contended that "EPA believes it is appropriate to grandfather," i.e., exempt, Avenal Power's application from the $NO_2$ and $SO_2$ hourly NAAQS, and the BACT requirement for greenhouse gases. EPA concluded that it possessed inherent grandfathering authority even absent express authorization under the Clean Air Act or related regulations. The EPA Administrator then transferred authority to issue a final decision on Avenal Power's application from the Regional Administrator for Region 9 to the Assistant Administrator for the Office of Air and Radiation. Consistent with its representation to the district court, EPA issued a Supplemental Statement of Basis

---

[2] EPA apparently took the position that the Avenal Energy Project would not run afoul of the new $SO_2$ hourly NAAQS. Nonetheless, EPA determined that compliance with the revised $SO_2$ and greenhouse gases regulations would require further public notice and comment proceedings, as well as hearings.

proposing to grandfather the application under the old air quality standards in effect at the time the application was submitted.

Petitioners submitted comments to EPA objecting to issuance of the Permit, and EPA's assertion of grandfathering authority. On May 26, 2011, as the administrative process continued to drag on, the district court granted in part Avenal Power's motion for judgment on the pleadings and ordered the EPA Administrator to render a decision by May 27, 2011, and a final, non-appealable, agency action ripe for judicial review by August 27, 2011. The next day, the Assistant Administrator for the Office and Air and Radiation published EPA's responses to the public comments, and issued the Permit.

Petitioners appealed to the Environmental Appeals Board, which declined to exercise jurisdiction to review EPA's asserted grandfathering authority, given the time constraint imposed by the D.C. district court for a final administrative action, but otherwise upheld issuance of the Permit.[3] Petitioners timely filed two separate petitions for judicial review, chiefly challenging EPA's interpretation of its statutory authority under the Clean Air Act.

We have jurisdiction pursuant to 42 U.S.C. § 7607(b)(1), and consolidated the two petitions for review. Avenal Power

---

[3] The Environmental Appeals Board also held that the Assistant Administrator (rather than the Regional Administrator) was authorized to issue the Permit, and that EPA's environmental justice analysis comported with Executive Order 12898. Because we hold that EPA exceeded its statutory authority, we need not address the latter issue, which Petitioners also raise for review.

successfully moved to intervene in these proceedings, and the United Association of Plumbers and Pipefitters Local 246, International Brotherhood of Electric Workers Local 100, and Insulators Local 16 successfully moved to file a brief as amici curiae.

## ANALYSIS

## I

As an initial matter, Avenal Power, though not EPA, suggests that Petitioners lack standing. It falls to Petitioners, as the parties invoking federal jurisdiction, to demonstrate standing.[4] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). However, only one Petitioner must establish standing to enable review. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1256 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). The record reflects, and Avenal Power

---

[4] Petitioners were not required to establish standing before EPA, and they now seek leave to submit declarations to establish standing for purposes of this appeal. Avenal Power does not oppose the request, and we grant it. *See Nw. Envt'l Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997) (accepting supplemental affidavits in support of petitioners' standing, where no such requirement applied in administrative proceedings).

does not dispute, that "the interests at stake are germane" to Petitioners' organizational interests, and that personal participation by Petitioners' individual members is not necessary. *Id.*

The only question remaining, therefore, is whether Petitioners' individual members have standing in their own right. On that score, Petitioners must first show that their members "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). And finally, "the injury will [likely] be redressed by a favorable decision." *Id.* at 561 (internal quotation marks omitted) (citing *Simon*, 426 U.S. at 38, 43).

## A

We first consider whether Petitioners, through the declarations of their members, have established an injury in fact. "An individual bringing a substantive claim related to environmental harms may establish an injury in fact by showing 'a connection to the area of concern sufficient to make credible the connection that the person's life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 484 (9th Cir. 2011) (quoting *Ecol. Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir.

2000)).  In addition, "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants" may establish an injury in fact.  *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001).

Here, although we have doubts as to the Sierra Club's standing, we are satisfied that Greenaction for Health and Environmental Justice, Center for Biological Diversity, and El Pueblo para el Aire y Agua Limpio, possess associational standing to challenge EPA's action.

Marciela Mares-Alatorre, the leader of El Pueblo para el Aire y Agua Limpio, lives in Kettleman City, which is located approximately 10 miles from the site of the Avenal Energy Project.  She was recently diagnosed with breathing difficulty and symptoms that indicate asthma, problems she avers are exacerbated when the air is more polluted.  She fears that the pollution expected from the Avenal Energy Project will impair her health.  Likewise, Mavi Sandoval, a member of El Pueblo para el Aire y Agua Limpio, as well as Center for Biological Diversity, lives in Kettleman City, works in Avenal, and states that she is concerned that her respiratory problems will also be exacerbated by pollution from the proposed plant.  Maria Saucedo, a member of Greenaction for Health and Environmental Justice, lives in Avenal and avers that her husband and daughter suffer from serious respiratory problems associated with air pollution. She believes that air pollution created by the proposed facility may further jeopardize the health of her family, and impact her husband's ability to work.  These health threats are credible, concrete, and, assuming the Project goes forward, imminent—in sum, cognizable injuries in fact.  *Id*.

**B**

As to causation and redressability, it is undisputed that the Avenal Energy Project will generate many tons of air pollutants known to threaten public health, including $NO_2$ and $SO_2$. Further, EPA implemented the revised $NO_2$ and $SO_2$ hourly NAAQS precisely because short-term exposure to those pollutants at ambient levels is associated with asthma and other respiratory ailments. *See* 42 U.S.C. § 7408(a)(1)(A) (commanding EPA Administrator to identify and regulate "emissions which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare"); *see also* Primary National Ambient Air Quality Standards for Nitrogen Dixoide, 75 Fed. Reg. at 6,479 (concluding that short-term exposure to ambient or near-ambient concentrations of $NO_2$ increased airway irritation for asthmatic individuals), *and* Primary National Ambient Air Quality Standards for Sulfur Dixoide, 75 Fed. Reg. at 35,525 (finding causal relationship between short-term exposure to ambient $NO_2$ and asthma and other respiratory symptoms). EPA also noted in its Supplemental Statement of Basis that short-term exposure to $NO_2$ likely causes adverse effects on the respiratory system. Given this record, we have little trouble concluding that $NO_2$ and $SO_2$ emissions from the proposed Project will likely cause the identified injuries. Indeed, remedying such injuries is exactly the purpose and function of these particular emissions limits, and more broadly, the Clean Air Act. It is therefore sufficiently clear that judicial review of EPA's refusal to enforce the relevant regulations will provide Petitioners' members with redress.

Accordingly, we conclude that at least Greenaction for Health and Environmental Justice, Center for Biological

Diversity, and El Pueblo para el Aire y Agua Limpio, have association standing to proceed. We need not decide whether Sierra Club has standing. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012) (citing *Watt v. Energy Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we hold that [one plaintiff] has Article III standing, we need not reach the question whether [another plaintiff] also has Article III standing").

## II

We now turn to the substance of Petitioners' challenge, that is, whether EPA exceeded its authority under the Clean Air Act. When we review an agency's interpretation of a statute that it is responsible for administering, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842–43. Only if "the statute is silent or ambiguous," *id.* at 843, "'must [we] decide how much weight to accord an agency's interpretation.'" *McMaster v. United States*, 731 F.3d 881, 889 (9th Cir. 2013) (quoting *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 940 (9th Cir. 2008)).

EPA contends there is ambiguity or tension between two mandates in the Clean Air Act—one, requiring it to enforce current NAAQS and BACT requirements, 42 U.S.C. § 7475(a)(1), (3)–(4), and the other, requiring EPA to act on applications within one year, *id.* § 7475(c). More specifically, EPA argues that the statute does not specify what it should do when, as was the case here, it failed to act by the statutory deadline, and revised air standards have been

promulgated since the deadline passed. Thus, the argument goes, EPA's decision to grant Avenal Power the Permit is entitled to *Chevron* deference. Petitioners, on the other hand, insist that the statutory language is clear—EPA must enforce the regulations in effect at the time the Permit was issued.

## A

We begin with the statute "'to determine whether the language at issue has a plain and unambiguous meaning. . . .'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). In so inquiring, we must endeavor to read the Clean Air Act "'as a symmetrical and coherent regulatory scheme,'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)), and "'fit, if possible, all parts into a harmonious whole[.]'" *Id.* (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).

The Clean Air Act states that "[n]o major emitting facility . . . may be constructed . . . unless":

> (3) the owner or operator of such facility demonstrates, as required pursuant to section 7410(j) of this title . . . that emissions from construction or operation of such facility will not cause, or contribute to, air pollution in excess of *any . . . national ambient air quality standard in any air quality control region . . .* [and]
>
> (4) the proposed facility is subject to the best available control technology for each

> pollutant subject to regulation under this chapter emitted from, or which results from, such facility . . . .

42 U.S.C. § 7475(a)(3)–(4) (emphasis added). The referenced portion of § 7410(j), in turn, provides:

> As a condition for issuance of any permit required by this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance *which are to apply to such source* . . . .

*Id.* § 7410(j) (emphasis added). The plain language of the statute—which prohibits the construction of any "major emitting facility" and refers to "any . . . national ambient air quality standard," and "the standards of performance which are to apply to such source[,]" as the applicable regulations—clearly requires EPA to apply the regulations in effect at the time of the permitting decision. 42 U.S.C. §§ 7475(a)(4), 7410(j); *see also* 40 C.F.R. § 52.21(k) (referring to "any national ambient air quality standard in any air quality control region").

Up until now, there has never been any doubt that Permit applicants must comply with current air quality control regulations and BACT requirements. Indeed, EPA initially advanced precisely this position against Avenal Power before

the D.C. district court, based on the public guidance it had previously provided in the form of the Page Memo.  To wit:

> EPA generally interprets the [Clean Air Act] and EPA's . . . permitting program regulations to *require that each final . . . permit decision reflect consideration of any NAAQS that is in effect at the time the permitting authority issues a final permit*.  As a general matter, permitting and licensing decisions of regulatory agencies must reflect the law in effect at the time the agency makes a final determination on a pending application.  [internal citations omitted].  [ ¶] Consistent with such interpretations, EPA has previously concluded that the relevant provisions cover any NAAQS that is in effect at the time of issuance of any permit.

Page Memo at 2 (emphasis added).

EPA's prior interpretation is supported by Supreme Court case law.  For example, in *Ziffrin, Inc. v. United States*, 318 U.S. 73, 78 (1943), petitioner Ziffrin Truck Lines challenged an order by the Interstate Commerce Commission ("ICC") rejecting its application for a permit to continue operating as a common carrier, in an effort to claim the benefit of a grandfathering clause in the Interstate Commerce Act.  While Ziffrin's application was still pending before the ICC—after a hearing was held, but before the application was ultimately denied—Congress amended the Interstate Commerce Act to require a finding by the ICC that grandfathering such a permit would serve the public interest. *Id.* at 75.  Applying the superseding requirement, the ICC

found grandfathering would not benefit the public, and denied Ziffrin a permit. The Supreme Court upheld the ICC's decision, explaining: "We are convinced that the Commission was required to act under the law as it existed when its order of [denial], was entered." *Id.* at 78. The Court reasoned:

> A change in the law between a nisi prius and an appellate decision requires the appellate court to apply the changed law. A fortiori, a change of law pending an administrative hearing must be followed in relation to permits for future acts. Otherwise the administrative body would issue orders contrary to the existing legislation.

*Id.* (citations omitted).

*General Motors Corp. v. United States*, 496 U.S. 530, 540 (1990), also provides support for the same basic principle that EPA is bound to enforce administrative guidelines in effect when it takes final action. Under certain provisions of the Clean Air Act not relevant to the present case, the states are required to propose State Implementation Plans to implement, maintain, and enforce NAAQS. *See generally* 42 U.S.C. § 7410(a)(1). The states also periodically revise the State Implementation Plans, with approval from EPA, which enforces them. *Id.* § 7410(a)(2)(H). In *General Motors*, EPA moved to enforce certain provisions of Massachusetts' existing State Implementation Plan. General Motors argued that EPA lacked the authority to initiate enforcement proceedings because, under the Administrative Procedure Act, EPA had "unreasonably" delayed review of certain proposed revisions to the State Implementation Plan that would have relieved General Motors of liability. *Id.* at

539–42.  The Supreme Court disagreed.  It held that EPA was authorized to enforce the then-existing State Implementation Plan regulations against General Motors, even assuming that, but for EPA's alleged unreasonable delay, a superseding State Implementation Plan relieving the company of liability would be in effect.  *Id.* at 540.  The Court noted that "[t]here is nothing in the statute that limits EPA's authority to enforce the 'applicable implementation plan' solely to those cases where EPA has not unreasonably delayed action on a proposed [State Implementation Plan] revision."  *Id.* at 541.

The same is true here.  Nothing in the statute precludes EPA from enforcing current NAAQS and BACT requirements even if it unreasonably delays taking action on a Permit.  Moreover, the Clean Air Act is not silent about the consequences of such delay.  "Congress *has* directly spoken to [that] precise issue"—namely, by providing a private right of action to compel timely action.  *Chevron*, 467 U.S. at 842 (emphasis added).  Under 42 U.S.C. § 7604(a)(2):

> Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

Avenal Power, of course, availed itself of this remedy and brought suit in the D.C. district court.  That court, correctly in our view, did not find the appropriate remedy to be issuance of the Permit without regard to the newly-

promulgated regulations.**[5]** Instead, it simply ordered the agency to come to a final decision. *See Avenal Power Ctr., LLC v. EPA*, 787 F. Supp. 2d 1, 4–5 (D.D.C. 2011).

Although EPA now maintains that, having missed the deadline to act, it cannot determine from the statute which substantive standards to enforce against Avenal Power, we discern no such uncertainty, and reject the agency's position that it possesses the power to resolve the matter as it sees fit. First of all, as a general matter, the agency's "authority and responsibility to resolve some questions left open by Congress that arise during the law's administration" does not extend to "include a power to revise clear statutory terms that turn out not to work in practice." *Utility Air Regulatory Grp. v. EPA*, No. 12-1146, — S. Ct. —, 2014 WL 2807314, at *13 (June 23, 2014) (citing *Barnhart*, 534 U.S. at 462). In other

---

**[5]** We find *Brock v. Pierce Cnty.*, 476 U.S. 253, 256 (1986), instructive in this regard. In *Brock*, a since-repealed provision of the Comprehensive Employment and Training Act required the Secretary of Labor to issue a final determination as to the misuse of certain funds within 120 days after receipt of a complaint alleging misuse. *Id.* Although the statute used mandatory language requiring the Secretary to investigate and issue formal findings, it did not specify consequences for the Secretary's failure to act. *Id.* at 258–59. The Court rejected the argument that the 120-day period was a statute of limitations that barred the Secretary from taking further action on the complaint after the 120-day period expired, reasoning: "We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake." *Id.* at 260. And the Court then concluded, instead: "When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Id.* (footnote omitted). The appropriate relief, the Court noted, was an order compelling the agency to act. *Id.* at 260 n.7.

words, "[a]n agency confronting resource constraints may change its own conduct, but it cannot change the law." *Id.*

Moreover, as for the particular proceedings at issue here, we do not believe EPA's legal or practical options were so conflicted, or even very uncertain. Although Petitioners suggest that EPA must deny a Permit application if it cannot perform the required review within the one-year limit, that does not appear to have been the agency's only option.[6] Even after the deadline passes, at least absent suit, EPA could presumably work with the applicant to ensure compliance with whatever regulations are in effect, and then issue or deny a Permit accordingly. In fact, that is what happened here: well after the deadline passed, EPA requested, and Avenal Power endeavored to provide, documentation demonstrating the Avenal Energy Project's compliance with the intervening $NO_2$ NAAQS. Ultimately, those efforts failed because Avenal Power could not demonstrate compliance with the Clean Air Act's requirements by the date set by the D.C. district court (a deadline imposed upon Avenal Power's own motion). But the parties' protracted negotiation of the Clean Air Act's requirements— frustrating and burdensome though it may have been in this case—does not endow the EPA with authority simply to waive the newly effective regulations on an ad hoc basis by "rewriting unambiguous statutory terms" in order to serve its own "bureaucratic policy goals." *Id.*

---

[6] We need not decide whether a petitioner, other than the Permit applicant, could sue EPA under 42 U.S.C. §§ 7604(a)(2), 7475(c), with the ultimate effect of forcing the agency to *deny*, without delay, a non-compliant Permit application.

## B

In an effort to bolster its position, EPA points out that it has long exercised authority to grandfather certain permit applications from revised regulations. That is true: EPA first asserted grandfathering authority shortly after the 1977 Amendments to the Clean Air Act passed. The issue at that time was a conflict between two apparently inconsistent provisions of the Clean Air Act—§ 165's enforcement requirements, and § 168's statutory grandfathering measures. *See Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 853–54 (D.C. Cir. 1979) ("[§] 168 would have the practical effect of allowing permits to be issued for the construction of many projects for which permits would be barred by the rigorous environmental standards of [§] 165" ). EPA ultimately chose not to make § 165 immediately effective, and grandfathered certain projects from its requirements. *See* 1977 Clean Air Act Amendments to Prevent Significant Deterioration, 43 Fed. Reg. 26,388, 26,391 (June 19, 1978) (adopting grandfathering for new permitting requirements for "any source the evaluation of which EPA would have completed before March 1, 1978, but for an extension of the public comment period pursuant to a meritorious request for such an extension"). The D.C. Circuit upheld the agency's decision in an opinion rendered prior to *Chevron*. *Id.* at 881–84. But EPA's decision, and the court's analysis, in that distinct statutory context does not resolve the question presented here.[7]

---

[7] To be clear, we do not doubt, or express any opinion on, EPA's traditional authority to employ formal rulemaking to implement grandfathering.

Since then, EPA has invoked grandfathering authority from time to time to exempt certain projects from newly-implemented NAAQS and BACT regulations. But EPA's traditional exercise of grandfathering authority does not at all resemble the ad hoc discretion the agency now claims to wield. When EPA implemented grandfathering in the past, it consistently did so through formal notice and comment rulemaking procedures, as expressly authorized by the Clean Air Act, 42 U.S.C. § 7601(a)(1), and the Administrative Procedure Act, 5 U.S.C. § 553. For example, just last year, when EPA implemented new standards for particulate matter ("PM"), it implemented grandfathering to smooth the transition process. As the agency explained:

In addition to today's revisions to the primary annual the $PM_{2.5}$ NAAQS, EPA is taking final action on a PSD implementation provision. To facilitate timely implementation of the PSD requirements resulting from the revised NAAQS, which would otherwise become applicable to all PSD permit applications upon the effective date of this final PM NAAQS rule, the EPA is finalizing a grandfathering provision for pending permit applications. This final rule incorporates revisions to the PSD regulations that provide for grandfathering of PSD permit applications that have been determined to be complete on or before December 14, 2012 or for which public notice of a draft permit or preliminary determination has been published as of the effective date of today's revised $PM_{2.5}$ NAAQS.

National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3,086, 3,249 (Jan. 15, 2013).

There is a significant difference between EPA's traditional grandfathering and its waiver of current applicable regulations in this case. On almost every prior occasion, EPA grandfathered a limited set of applications, in effect, by specifying an operative date (or dates) for each new regulation, as it was formally adopted.[8] In contrast to the ad hoc waiver here, the former procedure does not, on its face, violate the plain statutory mandate to enforce whatever regulations are in effect at the time the agency makes a final decision. That is because, in the past, EPA simply identified an operative date, incident to setting the new substantive standard, and the grandfathering of pending permit applications was explicitly built into the new regulations. *See Morton v. Ruiz*, 415 U.S. 199, 231–32 (1974) (holding that "[t]he power of an administrative agency to administer a congressionally created and funded program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress[,]" but noting that "[n]o matter how rational or consistent with

---

[8] *See, e.g.*, Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676, 52,681–83 (Aug. 7, 1980) (implementing grandfathering provision to facilitate implementation of new definitions of key terms and revised regulations); Regulations for Implementing Revised Particulate Matter Standards, 52 Fed. Reg. 24,672, 24,683 (July 1, 1987) (implementing grandfathering for newly promulgated NAAQS); Prevention of Significant Deterioration for Nitrogen Oxides, 53 Fed. Reg. 40,656, 40,659 (Oct. 17, 1988) (same); Prevention of Significant Deterioration for Particulate Matter, 58 Fed. Reg. 31,622, 31,632–33 (June 3, 1993) (same).

congressional intent a particular decision might be, [such decision] cannot be made on an ad hoc basis . . . ”).

The issue here is distinct.  EPA now claims the authority to waive the law's requirements at will, without regard to the regulations it has passed,[9] and without any precedential value one way or another for future parties.  That unbounded discretion exceeds the agency's authority.  We cannot discern any ambiguity or conflict between the Clean Air Act's enforcement requirements, and the statutory decision making deadline.  And the statute does not permit EPA to waive current NAAQS and BACT requirements whenever it finds it convenient to do so.  The foregoing conclusion ends the inquiry.  *Barnhart*, 534 U.S. at 450; *Chevron*, 467 U.S. at 842–43. Congress has spoken, and at least without applicable grandfathering provisions in the relevant regulations, EPA must enforce the regulations in effect at the time each Permit is issued, as the Clean Air Act clearly requires.

## C

Finally, EPA relies heavily on the argument that the equities weigh in favor of Avenal Power.  In short, we agree. Avenal Power filed its application over six years ago, and endeavored to work with EPA for years, even after filing suit, to obtain a final decision.  But however regrettable EPA's treatment of Avenal Power has been, we simply cannot disregard the plain language of the Clean Air Act, or overlook

---

[9] In fact, EPA expressly *refused* to adopt a grandfathering provision in connection with its promulgation of the greenhouse gases regulation at issue in this litigation.  *See* Reconsideration of Interpretation of Regulations That Determine Pollutants Covered by Clean Air Act Permitting Programs, 75 Fed. Reg. at 17,021–22.

the reason why an applicant must comply with revised and newly stringent standards —that is, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). Honoring the statute's plain language and overriding purpose, we must send EPA and Avenal Power back to the drawing board.

## CONCLUSION

For the foregoing reasons, we **GRANT** the Petition for review, **VACATE** the decision to issue the Permit, and **REMAND** for proceedings consistent with this opinion. Petitioners, as the prevailing parties, may recover the costs and fees incurred in this litigation from EPA. 42 U.S.C. § 7607(f); Fed. R. App. P. 39(a)–(b).