WALLACE, Circuit Judge,
dissenting:
The majority affirms the district court’s judgment, entered in the form of a consent decree, permitting a seven-year extension of a deadline imposed by the Clean Air Act (Act) for the Environmental Protection Agency (EPA or Agency) to fulfill a mandatory statutory duty. In so doing, the majority holds that this extension, which allows the Agency to collect additional data before carrying out its statutory duty, does not conflict with the Act. I disagree, and therefore respectfully dissent.
I.
When reviewing a consent decree, we employ an abuse of discretion standard. Conservation Nw. v. Sherman, 715 F.3d 1181, 1185 (9th Cir. 2013). “Abuse of discretion means that a decision rests on a clearly erroneous.finding of material fact or is the result of a failure to apply the correct law.” Id. (internal quotation marks omitted), quoting Turtle Island Restoration Network v. U.S. Dep’t of Commerce, 672 F.3d 1160, 1165 (9th Cir. 2012). Correspondingly, we review the district court’s conclusions of law de novo. Id.
II.
Although our review of the entry of a consent decree is deferential, the decree must meet certain baseline requirements to merit our approval. “Before approving a consent decree, a district court must be satisfied that it is at least fundamentally fair, adequate and reasonable. In addition, because it is a form of judgment, a consent decree must conform to applicable laws.” United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990) (internal citation omitted). The majority acknowledges this latter requirement, but its opinion contains virtually no analysis of the decree’s compliance with the Act. This omission makes all the difference — as I explain below, the decree *1070 in fact conflicts with the Act and therefore fails to “conform to applicable laws.” Id. Accordingly, I would vacate the judgment and remand for further proceedings. See Local No. 93, Int’l Ass’n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 526, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (stating that parties to a consent decree may not “agree to take action that conflicts with or wolates the statute upon which the complaint was based”); Conservation Nw., 715 F.3d at 1185 (“[A] district court may not approve a consent decree that ‘conflicts with or violates’ an applicable statute.” (quoting Local 93, 478 U.S. at 526, 106 S.Ct. 3063)).
A.
The. majority opinion ably outlines the Act’s requirements with respect to the issuance of national ambient air quality standards (NAAQS) and designations of compliance (or lack thereof) with such standards. To summarize briefly, the Act obliges the EPA to promulgate NAAQS with respect to airborne pollutants. 42 U.S.C. § 7409(a). Within two years of promulgating or revising a NAAQS, the Agency must designate every air quality control region within the country as not meeting the standard (“nonattainment”), meeting the standard (“attainment”), or not capable of designation “on the basis of available information” (“unclassiflable”). Id. § 7407(d)(1)(A)(i)—(iii), 7407(d)(1)(B)(i). This designation period may be extended for up to one additional year if the EPA Administrator “has insufficient information to promulgate the designations.” Id. § 7407(d)(1)(B)(i). Once an air quality control region has been designated, the Agency may redesignate it if “available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised.” Id. § 7407(d)(3)(A)-(C),
The EPA revised its sulfur dioxide NAAQS in 2010, thereby triggering its obligation to issue area designations within the statutory timeframe. But even after taking the full three years available to it, including the one-year extension allowed by the Act, the EPA issued designations for just twenty-nine regions, thus leaving most of the country undesignated. The EPA attempted to explain this decision by stating that it was “not yet prepared to issue designations” for the remaining regions and promising to do so “in separate future actions.” As the EPA admitted in the district court, its withholding of those designations constituted a failure to discharge a non-discretionary statutory duty. In short, the EPA failed to do what the legislature charged it to do with no real reason for its rejection of the congressional direction.
The consent decree seeks to remedy this failure by effectively rewriting the statute with a series of. staggered deadlines for completing designations that extends until December 31, 2020 — seven years after the congressional statutory cut-off date.' These deadlines appear to have been chosen without congressional approval to enable or at least permit the EPA to obtain additional information for making initial designations. This includes data that the States are now required to collect pursuant to a new regulation — the Data Requirements Rule (Rule) — that imposes more stringent information-gathering obligations than previously were applicable. In its order accepting the; party-drafted decree, the district court observed that the States likely would have to “supplement and update their previous submissions” if the Rule were adopted. The consent decree.bears this out, describing the Rule’s purpose as “direct[ing] states to conduct additional information collection and analyses ... for purposes of informing future area designations under the 2010 revised ... [sulfur dioxide] NAAQS.” It is thus clear that the parties agreed to the consent decree, and *1071 the district court approved it, on the understanding that the EPA would use the extra time, to collect additional data for making its initial designations. Absent from this “amendment” was the approval of Congress, which passed the statutory requirements being modified.
B.
District courts have “broad latitude in fashioning equitable relief when necessary to remedy an established wrong,” such as a. federal agency’s failure to take required action. Alaska Ctr. for Env’t v. Browner, 20 F.3d 981, 986 (9th Cir. 1994). We have held that this latitude even permits a court faced with such procrastination to effectively amend the statute by establishing “deadlines that are far more lenient than those contained within the [statute] itself.” Id.
At least for now, this is the framework we must use to review the district court’s approval of the consent decree. Before proceeding further, however, I want to register my strenuous disagreement with' this unfortunate rule. It thrusts courts into a quasi-legislative role for which they are poorly equipped. Although it is impossible to compel an agency’s compliance with a statutory deadline once it has passed, and a court must take some action to remedy the failure, it does not follow that the proper course of action is for the court to assume the legislative mantle and effectively rewrite the agency’s statutory obligations. As an institution, we lack the considerable investigative resources and deliberative capacity available to' Congress when it crafts statutes like the Act to govern agency action. We therefore should be hesitant to jettison the legislature’s considered judgment regarding issues like the one before us. While we frequently chant the importance of separation of powers to protect .the .judiciary, this rule seems to say there is no breach when we invade the legislative branch.
. .Nor is the possibility of undermining congressional intent under such a- rule limited to the courts. .Agencies themselves can evade the “especially heavy” burden to justify departing from “a statutory command,” Ala. Power Co. v. Costle, 636 F.2d 323, 359-50 (D.C. Cir. 1979), merely by disregarding their deadlines, since they can' count on the courts to impose new deadlines — and sometimes “far more lenient” ones — that necessarily post-date the ones contained in relevant statutes. See Browner, 20 F.3d at 986. It would be far better for us to refrain from such legislative ventures and limit our role to ordering agencies to comply with their statutory duties as early as practicable, and if they cannot, they should return to the legislature for a solution.
C.
Nonetheless, we cannot, as a panel, overrule our precedent. Nor need we to resolve this case, for the consent decree does not merely set deadlines “far more lenient than those contained within the [statute] itself.” Id. As explained, the consent decree in effect authorizes the EPA to collect additional data before issuing its initial designations; indeed, the decree’s deadlines are predicated on the assumption that that is how the Agency will use the- additional time. The Act, however, forbids such additional data-gathering when it comes at the expense of timely designations. The parties were powerless to dispense with this proscription,1 and the district court lacked authority to approve their agreemerit to do So.
Three of the Act’s provisions, taken together, reflect Congress’s intent to restrict the EPA’s data-gathering authority in the situation before us, where the Agency desires to collect more data before making initial designations. The first is the. one-year extension available to the EPA Ad *1072 ministrator when the Agency lacks the necessary information to make initial designations after two years. The second relevant provision is the unclassifiable designation category, which is meant to fill the gap when the information available to the Agency does not support either an attainment or nonattainment designation. The third provision is the redesignation process, which allows the EPA to revise its initial designations as the data warrant.
1.
Regarding the extension provision, the Act requires the EPA to issue designations within two years of promulgating or revising a NAAQS, but permits the Agency to extend that deadline “for up to one year in the event the Administrator has insufficient information to promulgate the designations.” 42 U.S.C. § 7407(d)(l)(B)(i). The Act provides for no further extensions. In this provision, then, Congress anticipated the EPA’s desire to delay designations specifically for the purpose of collecting additional data, and determined that it would cap the Agency’s ability to do so at one extra year. Thus, Congress specifically intended that the EPA only be able to collect a maximum of three years’ worth of data before making initial designations. Permitting the Agency to gather data for up to seven additional years, as the consent decree does, therefore frustrates Congress’s intent. Cf. Sierra Club v. EPA, 294 F.3d 155, 160 (D.C. Cir. 2002) (“We cannot but infer from the presence of ... specific exemptions that the absence of any other exemption ... was deliberate, and that the Agency’s attempt to grant such a dispensation is contrary to the intent of the Congress.”).
2.
The second pertinent provision, the unclassifiable designation category, buttresses this reading. An unclassifiable designation is appropriate for “any area that cannot be classified on the basis of available information.” 42 U.S.C. § 7407(d) (1) (A) (iii). Such a designation presupposes that'the EPA may not be able to collect sufficient data to make a designation of attainment or nonattainment within the statutorily designated time limit, and any area not so designated is unclassifiable at that time. It also implies that the Agency’s data-gathering authority is temporally limited. If it were not, then there would be no need for the unclassifiable designation — the Agency could simply delay making designations indefinitely until it obtained enough information to designate all areas as attainment or nonattainment. The inclusion of the unclassifiable designation therefore makes sense only if Congress understood the Act to require the EPA to make initial designations, at least in some cases, before the Agency finished gathering all of the data needed to make attainment or nonattainment designations. Allowing the Agency to withhold its designations until it gathers the necessary data to make one of those designations would render the unclassifiable designation provision superfluous. The Agency’s interpretation of. these designations thus makes no sense and is unnecessary for carrying out its statutory responsibility.
This is not to say that the consent decree in fact authorizes the EPA to delay its initial designations until it has collected sufficient information to designate all areas as attainment or nonattainment. It is possible that the Agency may have to designate some areas as unclassifiable even at the end of the decree’s generous timeline. But that does not mean that the decree is consistent with the Act. By granting the Agency up to seven extra years to make initial designations, the decree adds a fourth option, which appears nowhere in the statute, to the list of actions the EPA may take at the conclusion of the Act’s *1073 three-year information-gathering period: withhold. Instead of performing its mandatory duty to designate all areas with one of the three labels, the EPA instead may simply refuse and continue to collect data, contrary to Congress’s intent, until whatever future deadline a court may see fit to impose. The consent decree itself, of course, does not demand such an outcome because it applies only in this case. But we can approve the consent decree only by holding that the Act allows for such an expansion of the Agency’s data-gathering authority, and that holding certainly will control the outcome of future cases.
3.
The third provision germane to this issue is the redesignation process, which authorizes the EPA to redesignate an area when the information available to the Agency indicates that a new designation is warranted. Id. § 7407(d)(3)(A) — (C). Like the unclassifiable designation, the inclusion of this provision makes sense only if the Act sets a hard deadline for making initial designations even when the Agency would prefer to collect additional data. The re-designation process acts as an escape hatch to mitigate the otherwise undesirable consequences of requiring initial designations before all the relevant data are gathered. Without redesignation, the EPA would be either stuck with its initial designations or forced to promulgate another NAAQS and start the designation process over if subsequent data brought the initial designations into question. But -with redes-ignation, the EPA can both meet the statutory deadline for making initial designations and ensure that its designations at all times reflect the most current data available. If the Act allowed the EPA to continue collecting data without making an initial designation until it was satisfied that its research was complete, the redesignation option would be of little or no practical value.
D.
Read together, these provisions clarify Congress’s intent with respect to situations — like this one — -where the EPA wishes to delay designations so that it can collect additional relevant information. Congress determined that the Agency should be able to gather data for a maximum of three years before making initial designations. If the Agency lacks sufficient information to designate areas as attainment or nonattainment at the end of those three years, it should make use of the unclassifiable designation for such areas. Once it issues initial designations, the Agency can then continue to gather information and redesignate areas as the data warrant. The EPA’s delay in this case, and the consent decree’s extended deadlines premised on the assumption that the Agency will continue to gather data in the interim, frustrate this purpose by greatly enlarging the time in which the Agency can collect information without ever making an initial designation.
The interpretation I suggest is consistent with both the Act’s goal “to protect and enhance the quality of the Nation’s air resources so as to promote the public health and welfare,” id. § 7401(b)(1), and its character as “an exercise in cooperative federalism.” Dominion Transmission, Inc. v. Summers, 723 F.3d 238, 240 (D.C. Cir. 2013); see also Gen. Motors Corp. v. United States, 496 U.S. 530, 532, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990) (describing the Act as “a comprehensive national program that made the States and the Federal Government partners in the struggle against air pollution”). As the Intervenor-Appellants point out, this process provides “regulatory certainty” by creating a defined timeframe for receiving designations, which impose certain obligations on states in crafting their implementation plans. See 42 U.S.C. §§ 7407(a), 7502. At the same *1074 time, it affords the EPA the means to ensure its designations are based on the most up-to-date information available. Approving the consent decree, and thus blessing similar future extensions by district courts confronting agency intransigence, runs roughshod over the states’ interests in favor of vindicating the EPA’s desire to depart from the rulés Congress has mandated for it. If the Act’s three-year data-collection timeframe is inadequate, the Agency’s remedy lies with the legislature, not the courts.
III.
The EPA argues that the consent decree is consistent with Sierra Club v. EPA, 762 F.3d 971 (9th Cir. 2014), where we. held that the Agency’s failure to issue a power plant operation permit timely did not exempt it from applying the most updated air quality standards, which had gone into effect after the missed deadline, when it finally issued the permit. Id. at 983. In so concluding, we relied on the “basic principle that EPA is bound to enforce administrative guidelines in effect when it takes final action.” Id. at 980. Taken- at face value, this principle Would require the Agency to abide by the now-operative Rule’s requirements in issuing its designations.
Sierra' Club is distinguishable because applying the applicable- guidelines in that case was consistent with the Act’s requirements, whereas postponing the designations here so that the EPA can collect more data conflicts with the Act. But.even if this aspect of Sierra Club extends to the situation before us, nothing in -the Rule actually forces the Agency to delay the making of one of the three'initial designations while it collects the data that- the Rule calls for. See 40 C.F.R. §§ 51.1200-.1205. The Rule requires neither that the EPA gather additional data before making the designations nor that it withhold those designations until the deadlines established in the consent decree. Consequently, the Agency’s- obligation to enforce the Rule, such as it is, does not demand the outcome imposed by the consent decree.
The two cases cited for the proposition thát the EPA is “no stranger” to consent decrees like the one before us likewise are unhelpful to the majority’s analysis. In Mississippi Commission on Environmental Quality v. EPA, 790 F.3d 138 (D.C. Cir. 2015), to which Sierra Club was a party, the D.C. Circuit reviewed the Agency’s refusal to delay its designations to gather more data, even though it previously had entered into a consent decree that permitted it to do so. Id. at 158. The court sided with the EPA, observing that the Agency would have “infringe[d] the Act’s deadlines still further” had it delayed as Sierra Club was urging. Id. If anything, then, Mississippi Commission acknowledged that prolonging a delay in issuing overdue designations to collect additional data conflicts with the Act.
Natural Resources Defense Council v. EPA, 777 F.3d 456 (D.C. Cir. 2014), fares no better. There, the D.C. Circuit merely recognized that, as part of a different case, the Agency had entered into a consent decree requiring it to issue designations within four years of promulgating a revised NAAQS; the court did not review that decree or hold that it complied with the Act. See id. at 462-63, 467; see also Air Quality Designations for the 2008 Ozone National Ambient Air Quality Standards, 77 Fed. Reg. 30,088, 30,091 (May 21, 2012) (identifying the case in which the consent decree was entered). Although it appears that the Agency permitted states to update their submissions during the fourth year, and thus obtained additional data before making initial designations, 77 Fed. Reg, at 30,091, neither the consent decree nor the act of collecting additional data was subject to appellate review. Accordingly, *1075 Natural Resources Defense Council does not support the proposition that extending the EPA’s initial designation deadline so it can gather more data is consistent with the Act.
Nor does the majority’s characterization of the decree as a “non-suit agreement” redeem it. It is not clear exactly what role this characterization of the consent decree plays in the majority’s analysis. To the extent the majority is trying to distinguish this consent decree from others, all consent decrees operate in the same way. It is always the case that one or more parties refrains from pressing its claims as long as the other party (or parties) abides by the terms of the consent decree. The decree in our case is not unique in that sense.
What the majority appears to be employing is a “no harm, no foul” rationale— because the effect of the consent decree is only to halt Sierra Club’s and Natural Resources Defense Council’s (NRDC) claims against the EPA while leaving intact the Intervenor-Appellants’ claims, the decree has no consequential legal effect. I do not agree. As explained above, we can affirm the district court’s judgment only by holding that the consent decree “conform[s] to applicable, laws.” Oregon, 913 F.2d at 580. There is no exception for decrees that operate as effective non-action agreements. (Such an exception would swallow the rule; as just mentioned, all consent decrees are non-action agreements as the majority uses that term.) Approval of the consent decree therefore has a legal effect of significant consequence: it amounts to a holding that the decree’s expansion of the Agency’s pre-designation data-collection authority does not conflict with the Act.
I cannot go along with this conclusion. I believe that the consent decree does conflict with the Act by permitting the EPA to delay its initial designations while it collects more data. The separation of powers doctrine forbids our amending the statute — only the Congress can do that. The EPA can return to the legislative branch— but should not be allowed to misuse the judicial branch. The district court’s judgment should be vacated and the case remanded for the parties to try again or for the district court to determine an appropriate remedy that complies with all applicable laws.