*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SOUTH DEARBORN ENVIRONMENTAL
IMPROVEMENT ASSOCIATION, INC.,

      Petitioner-Appellant,

and

DETROITERS WORKING FOR
ENVIRONMENTAL JUSTICE, ORIGINAL
UNITED CITIZENS OF SOUTHWEST DETROIT,
and SIERRA CLUB,

      Petitioners,

v

DEPARTMENT OF ENVIRONMENTAL
QUALITY and DAN WYANT,

      Respondents-Appellees,

and

AK STEEL CORPORATION,

      Appellee.

FOR PUBLICATION
March 18, 2021
9:10 a.m.

No. 350032
Wayne Circuit Court
LC No. 14-008887-AA

Before: TUKEL, P.J., and JANSEN and CAMERON, JJ.

CAMERON, J.

South Dearborn Environmental Improvement Association, Inc. (South Dearborn), an environmental advocacy group, appeals a circuit court order affirming the Department of

-1-

Environmental Quality's (the DEQ) decision to issue a permit for an existing source of air pollution to Severstal Dearborn, LLC (Severstal).[1] We affirm.

## I. BACKGROUND

This appeal arises out of the DEQ's decision to issue Permit to Install (PTI) 182-05C in 2014. Before PTI 182-05C was issued, the DEQ had issued three earlier permits: PTI 182-05, PTI 182-05A, and PTI 182-05B. In a prior appeal concerning the issuance of PTI 182-05C, our Supreme Court summarized the facts surrounding the issuance of the permits as follows:

> AK Steel operates a steel mill within the Ford Rouge Manufacturing complex in Dearborn, Michigan. Before being acquired by AK Steel in 2014, the steel mill was operated by Severstal Dearborn, LLC (Severstal). The steel mill is subject to air pollution control and permitting requirements under the federal Clean Air Act, 42 USC 7401 *et seq.*, and the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq*. In order to comply with the Clean Air Act, Part 55 of the NREPA requires the DEQ to promulgate rules to establish a permit-to-install program, MCL 324.5505(2), and an operating-permit program, MCL 324.5506(4).

> In 2006, the DEQ issued Severstal a permit to install titled "PTI 182-05," which authorized the rebuilding of a blast furnace and the installation of three air pollution control devices at Severstal's steel mill. In the years that followed, the permit was revised twice, first in 2006 (PTI 182-05A) and again in 2007 (PTI 182-05B). Each successive permit modified and replaced the preceding permit.

> Emissions testing performed in 2008 and 2009 revealed that several emission sources at the steel mill exceeded the level permitted by PTI 182-05B. The DEQ sent Severstal a notice of violation, and after extended negotiations, they entered into an agreement, pursuant to which Severstal submitted an application for PTI 182-05C. The DEQ issued the permit on May 12, 2014, after a period of public comment and a public hearing as prescribed by the NREPA, MCL 324.5511(3). The DEQ stated that the purpose of PTI 182-05C was to correct inaccurate assumptions about pre-existing and projected emissions and to reallocate emissions among certain pollution sources covered by the permit to install.

> On July 10, 2014, 59 days after PTI 182-05C was issued, appellee South Dearborn Environmental Improvement Association, Inc. (South Dearborn) and a number of other environmental groups appealed the DEQ's decision by filing a petition for judicial review in the Wayne Circuit Court. [*South Dearborn Environmental Improvement Ass'n, Inc, v Dep't of Environmental Quality*, 502 Mich 349, 355-357; 917 NW2d 603 (2018) (footnotes omitted).]

---

[1] Intervening appellee, AK Steel, acquired Severstal after the DEQ issued PTI 182-05C.

After the petition for judicial review was filed in the circuit court, AK Steel purchased the steel mill, intervened in the appeal, and then filed a motion to dismiss under MCR 2.116(C)(1) (lack of jurisdiction). AK Steel argued that South Dearborn's petition for judicial review was untimely filed and, therefore, the circuit court lacked jurisdiction over the case. The circuit court concluded that South Dearborn had 90 days from the date that PTI 182-05C was issued to file a petition for judicial review. The circuit court thereafter found that South Dearborn's petition was timely filed and denied AK Steel's motion to dismiss.

AK Steel applied to this Court for leave to appeal the circuit court's decision on jurisdiction. This Court affirmed, but on different grounds. Specifically, this Court held that the petition was timely because it was filed within the 60-day period provided by MCR 7.119. *South Dearborn Environmental Improvement Ass'n, Inc v Dep't of Environmental Quality*, 316 Mich App 265, 277-278; 891 NW2d 233 (2016), vacated in part by 502 Mich 349 (2018).

AK Steel sought leave to appeal in the Michigan Supreme Court. Following oral argument, our Supreme Court harmonized the provisions of MCL 324.5505(8) and MCL 324.5506(14) and held that "a petition for judicial review of a permit to install for an existing source must be filed within 90 days of the permit being issued." *South Dearborn Environmental Improvement Ass'n Inc*, 502 Mich at 370-372. Accordingly, because the petition for judicial review was timely filed 59 days after PTI 182-05C was issued, our Supreme Court held that the circuit court properly denied AK Steel's motion to dismiss, and the matter was remanded to the circuit court for further proceedings. *Id*. at 374.

Between September 2018 and December 2018, the parties filed their briefs in the circuit court. South Dearborn argued that the DEQ's issuance of PTI 182-05C was not authorized by law. In essence, South Dearborn argued that the DEQ unlawfully processed Severstal's permit in a way that allowed the company to evade a number of current air pollution standards. South Dearborn further argued that the 2014 modification of the 2007 permit was not authorized or governed by any rule, and that the modification specifically violated rules promulgated by the agency. South Dearborn asserted that, as a result of these irregularities, the DEQ's issuance of PTI 182-05C was contrary to law, in excess of the agency's authority, based on improper procedure, and arbitrary and capricious.

In response, the DEQ and AK Steel argued that the case did not involve a typical challenge to an air pollution permit that authorized changes to a factory or new construction of pollution emission sources. Instead, the matter involved a simple modification to an existing permit to update certain emission limits in the 2007 permit. The DEQ argued that federal regulations promulgated after 2007 to limit certain emissions did not apply because Severstal was not proposing to make major changes to its mill. The DEQ asserted that, under these circumstances, it had no authority to impose post-2007 air pollution regulations on Severstal.

Following a hearing in July 2019, the circuit court affirmed the DEQ's decision to issue PTI 182-05C.[2] At the outset, the circuit court explained that it was to determine whether the DEQ's decision was authorized by law. The circuit court noted that a decision was not authorized by law if it violated a statute or constitution, exceeded the agency's statutory authority or jurisdiction, materially prejudiced a party as a result of unlawful procedure, or was arbitrary and capricious. The circuit court then found that the DEQ's decision was authorized by law. Specifically, the court found that the DEQ, when issuing PTI 182-05C, was permitted to consider and apply the circumstances that existed when PTI 182-05B was issued in 2007. This appeal followed.

## II. STANDARDS OF REVIEW

"A final agency decision is subject to court review but it must generally be upheld if it is not contrary to law, is not arbitrary, capricious, or a clear abuse of discretion, and is supported by competent, material and substantial evidence on the whole record." *Vanzandt v State Employees Retirement Sys*, 266 Mich App 579, 583; 701 NW2d 214 (2005). See also Const 1963, art 6, § 28. In this case, Part 55 of the NREPA does not require the DEQ to conduct an administrative hearing before it issues a permit. Consequently, no contested hearing was held.

> When the agency's governing statute does not require the agency to conduct a contested case hearing, the circuit court may not review the evidentiary support underlying the agency's determination. Judicial review is limited in scope to a determination whether the action of the agency was authorized by law. The agency's action was not authorized by law if it violated a statute or constitution, exceeded the agency's statutory authority or jurisdiction, materially prejudiced a party as the result of unlawful procedures, or was arbitrary and capricious. Courts review de novo questions of law, including whether an agency's action complied with a statute. [*Natural Resources Defense Council v Dep't of Environmental Quality*, 300 Mich App 79, 87-88; 832 NW2d 288 (2013) (quotation marks and citations omitted).]

Further, "[a] ruling is arbitrary and capricious when it lacks an adequate determining principle, when it reflects an absence of consideration or adjustment with reference to principles, circumstances, or significance, or when it is freakish or whimsical." *Henderson v Civil Serv Comm*, 321 Mich App 25, 44; 913 NW2d 665 (2017) (quotation marks and citation omitted). "This Court adopted this particular formulation of the authorized-by-law standard, in part, because it

---

[2] Initially, the circuit court noted that the issues deserved, and in other circumstances would have warranted, a written opinion. However, the court indicated that it would not be pursuing that course because a prompt resolution of the petition for judicial review was equally important. The circuit court noted that the appeal had been pending for some time and that a written opinion might take several weeks to prepare. The circuit court then explained that it was sitting as a visiting judge on a temporary assignment and, as such, the judge might not be assigned to the court in a few weeks. The circuit court also declined to pass on a decision and leave it to the judge's successor, noting that that course would only further postpone resolution of the issues. For these reasons, the circuit court concluded that it would be more prudent to simply issue an oral opinion from the bench.

focuses on the agency's power and authority to act rather than on the objective correctness of its decision." *Id*. (quotation marks and citation omitted).

Finally, "[w]hether a circuit court applied the appropriate standard of review is a question of law that this Court reviews de novo." *Natural Resources Defense Council*, 300 Mich App at 87.

## III. ANALYSIS

In both the circuit court and this Court, South Dearborn challenges the DEQ's issuance of PTI 182-05C on several fronts. Its primary contention, however, is that through the DEQ's permit authorization process, Severstal was illegally allowed to evade current air pollution rules, which are more stringent than when the original PTI was issued. South Dearborn contends that the DEQ's issuance of PTI 182-05C permitted Severstal to benefit from "grandfathering" in the standards that existed in 2007. It asserts that PTI 182-05B should have been revoked and that Severstal should have been required to submit a new application, which would then be subject to the air quality rules in effect at the time the new permit was issued. Notwithstanding South Dearborn's many and varied arguments, we conclude that the manner in which the DEQ issued PTI 182-05C was authorized by law.

At the outset, it cannot seriously be disputed that the DEQ possesses the authority to modify permits previously issued. MCL 324.5503(c), in general, authorizes the DEQ to "deny, terminate, modify, or revoke and reissue permits for cause." Consistent with this authority, it is also clear that the DEQ's issuance of PTI 182-05C was to effectuate a modification of the 2007 permit. The permit application indicated that Severstal was seeking a "correction to PTI 182-05B for the Severstal Dearborn facility located in Dearborn, MI." Severstal provided that,

> [t]his correction is to update emission factors from the previous application based on recent emissions test data. In addition, Severstal will reallocate SO2 emissions from the stove and casthouse stacks located at the blast furnaces.
>
> This application is not requesting to make any physical changes, changes to the method of operation, or increase in production rate/throughput for the equipment at the facility.

Similarly, the DEQ explained that the proposed permit would

> [u]pdate the emission factors for particulate matter . . . that were used in the 2005 application to establish permit limits, . . . [r]evise the PTI 182-05 series of permits by reallocating $SO_2$ emissions within the stove and casthouse stacks at the blast furnaces[,] [and] [r]econfirm the Prevention of Significant Deterioration (PSD) applicability analysis and associated emission netting presented in PTI 182-05B.

The DEQ also noted that there would "not be any physical changes, changes to the method of operation, or increase in annual production rate/throughput for the equipment at the stationary source beyond what was approved in PTI 182-05B."

Notwithstanding the general grant of authority and the limited nature of the modification of the 2007 permit, South Dearborn argues that the DEQ was required to apply air pollution standards promulgated after 2007 when it issued the permit. Resolution of this issue involves, to some degree, statutory interpretation.

> The principal goal of statutory interpretation is to give effect to the Legislature's intent, and the most reliable evidence of that intent is the plain language of the statute. When interpreting a statute, we must give effect to every word, phrase, and clause and avoid an interpretation that would render any part of the statute surplusage or nugatory. [*South Dearborn Environmental Improvement Ass'n, Inc*, 502 Mich at 360-361 (quotation marks and citations omitted).]

Moreover, "[n]ontechnical words and phrases should be construed according to their plain meaning, taking into account the context in which the words are used." *Id*. at 361 (quotation marks and citation omitted; alteration in original). Administrative rules are interpreted in an identical manner. *Brang, Inc v Liquor Control Comm*, 320 Mich App 652, 661; 910 NW2d 309 (2017) ("Just as with statutes, the foremost rule in construing an administrative rule, and our primary task, is to discern and give effect to the administrative agency's intent.").

As the DEQ correctly notes, no provision of Part 55 of the NREPA requires the DEQ to apply all "current" regulations when it issues a permit. Instead, MCL 324.5505(5)(a) provides that permits shall

> [i]nclude terms and conditions necessary to assure compliance *with all applicable requirements* of this part, the rules promulgated under this part, and the clean air act, including those necessary to ensure compliance with *all applicable* ambient air standards, emission limits, and increment and visibility requirements pursuant to part C of title I of the clean air act . . . at each location." [Emphasis added.]

The current air quality regulations that South Dearborn asserts should have been imposed only apply if Severstal had proposed "major modifications" in its PTI 182-05C application. See Mich Admin Code, R 336.2802(2); Mich Admin Code, R 336.2902(1). A major modification is defined by Rule 336.2801(aa)(i), in relevant part, as a "[p]hysical change in or change in the method of operation of a major stationary source" that results in "[a] significant emissions increase of a regulated new source review pollutant" and "[a] significant net emissions increase of that pollutant from the major stationary source." As indicated in the application, Severstal was not proposing a major modification.

Nonetheless, without any substantive discussion, South Dearborn cites *Ziffrin v United States*, 318 US 73; 63 S Ct 465; 87 L Ed 621 (1943), for the proposition that "[a]n agency must apply the law in effect at the time of its permitting decision." However, the facts in that case are easily distinguishable from the facts herein. In *Ziffrin*, an Indiana corporation was denied "a permit to continue designated contract carrier operations under the grandfather clause of Section 209(a) of the Interstate Commerce Act[.]" *Ziffrin*, 318 US at 74. The law changed between the time the application was filed and the order denying the application was entered. *Id*. at 75. In upholding the Interstate Commerce Commission's decision, the Supreme Court held that "the Commission was required to act under the law as it existed when its order of May 29, 1941, was entered." *Id*.

at 78.  The Court further explained, "A fortiori, a change of law pending an administrative hearing must be followed in relation to permits for future acts.  Otherwise the administrative body would issue orders contrary to the existing legislation."  *Id*.

Thus, *Ziffrin* did not involve an amendment to or a modification of an existing permit.  Instead, at issue in *Ziffrin* was a permit for future acts.  *Id*.  In this case, the relevant action had already occurred pursuant to the earlier permit, PTI 182-05B.  As already stated, the DEQ indicated that there would "not be any physical changes, changes to the method of operation, or increase in annual production rate/throughput for the equipment at the stationary source beyond what was approved in PTI 182-05B."  For this reason, the analysis in *Ziffrin* is not relevant.

Additionally, contrary to South Dearborn's arguments, the DEQ specifically stated that it was not issuing a "grandfathered" permit.  In its response to the public comments, the DEQ explained:

> The [Air Quality Division] is not issuing a "grandfathered" permit, there is no such permit.  The application is not subject to current [Prevention of Significant Deterioration] requirements for the C Blast Furnace project because the proposed changes did not constitute a modification under those rules, however, the applicant did confirm that the previous CO and $SO_2$ [Best Available Control Technology] analyses were still valid.  The proposed emission increases were not a result of increased production or operation, but the result of limited information at the time of the original application.

Moreover, South Dearborn's reliance on *Sierra Club v US Environmental Protection Agency*, 762 F3d 971 (CA 9, 2014) (*Avenal*), for the proposition that "grandfathering" during all permitting decisions is prohibited, is misplaced.  In that case, Avenal Power applied to the United States Environmental Protection Agency (the EPA) for a PSD permit to build and operate a power plant.  *Id*. at 973.  Although the EPA was statutorily required to grant or deny the permit application within one year, it failed to do so.  *Id*.  "After the deadline passed but before taking any final action, EPA tightened the applicable air quality standards."  *Id*.  Thereafter, Avenal "filed suit and sought to compel EPA to issue the [PSD permit] under the old standards that would have applied had EPA acted within the statutory deadline."  *Id*.  Initially, the EPA responded that it was not legally allowed to do so and that it was required to impose the air quality standards in effect at the time the permit was issued.  *Id*.  "Months later, however, EPA reversed course and granted Avenal Power the [PSD] Permit without regard to the new regulations, which by then had gone into effect."  *Id*.

Environmental groups, including the Sierra Club, challenged the EPA's actions.  *Id*.  On appeal to the United States Court of Appeals for the Ninth Circuit, the EPA asserted that, under narrow circumstances, it had authority to grandfather certain permit applications like Avenal Power's and that its decision to do so was entitled to deference.  *Id*. at 982-983.  The Ninth Circuit disagreed, holding that the Clean Air Act unambiguously required Avenal Power to demonstrate that the energy project complied with the regulations in effect at the time the permit was issued.  *Id*. at 982-984.  However, it is important to note that the court did not hold that the policy of grandfathering was prohibited in all permit application decisions.  *Id*. at 982 n 7.  Instead, the Court reviewed the language of the Clean Air Act applicable to the proposed construction of a new major

emitting facility and concluded that, as to those types of permits, the Clean Air Act "clearly requires EPA to apply the regulations in effect at the time of the permitting decision." *Id*. at 979.

As the DEQ correctly notes, the present case is fundamentally different. Unlike the permit application in *Avenal*, there is no statutory authority that required the DEQ to impose regulations promulgated postconstruction when it modifies emission standards in a preconstruction permit. Furthermore, unlike in *Avenal*, no construction was contemplated in relation to PTI 182-05C. For these reasons, *Avenal* is inapplicable.

In an apparent anticipation of these conclusions, South Dearborn asserts that PTI 182-05C was not written as an amendment to the 2007 permit but was, in fact, a "new permit" authorizing physical modifications and production increases. South Dearborn then reasons that because physical modifications were authorized by PTI 182-05C, "the permit cannot reflect only the testing data acquired after 2007—it must also reflect the air pollution rules imposed since then." To support this proposition, South Dearborn notes that in the DEQ documents, the agency indicated that the prior permit was "void." It is unclear to us how considering a prior permit void supports the proposition that PTI 182-05C was not an amendment, but rather an entirely new permit authorizing physical modifications. Clearly, if an amended permit was issued, the prior permit would be replaced.

South Dearborn also argues that because "the new permit purports to retroactively re-approve the production increase and equipment changes that were approved in the old permit," PTI 182-05C "authorize[s] physical modifications and production increase at the Severstal facility." However, when arguing that PTI 182-05C authorized "physical modifications," South Dearborn readily admitted, "It just happens that in this case, those changes and increases were already completed." Acknowledging that the construction referenced by PTI 182-05C had already been completed pursuant to PTI 182-05B renders disingenuous South Dearborn's claim that PTI 182-05C was not an amendment, but rather a new permit authorizing "physical modifications."

South Dearborn next asserts that the issuance of PTI 182-05C was not authorized by law because the DEQ did not promulgate rules to govern the modification of existing permits. However, South Dearborn has provided no compelling authority for the proposition that specific rules governing modification of permits were required. Rather, in support of its argument, South Dearborn cites MCL 324.5503(c), which provides that the DEQ has the authority to "deny, terminate, modify, or revoke and reissue permits for cause." South Dearborn further relies on MCL 324.5505(2), which provides:

> The department shall promulgate rules to establish a permit to install program to be administered by the department. Except as provided in subsections (4) and (5), the permit to install program is applicable to each new or modified process or process equipment that emits or may emit an air contaminant.

South Dearborn contends that by reading these two provisions together, the DEQ could not modify a permit "in accordance with" Part 55 of the NREPA and its rules unless it promulgated rules for permit modification.

However, South Dearborn has cited no specific provision within Part 55 of the NREPA that imposes a mandatory duty on the DEQ to promulgate regulations regarding permit modifications. Indeed, MCL 324.5512 identifies several areas where the DEQ "shall" promulgate rules. See *Wolfenbarger v Wright*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 350668); slip op at 15 (noting that "[t]he use of the word 'shall' denotes mandatory action"). Noticeably absent from this list is a mandate to promulgate rules related to permit modifications. MCL 324.5512(1). Instead, MCL 324.5512(1) addresses, in general, the mandatory promulgation of rules related to controlling or prohibiting air pollution. In particular, MCL 324.5512(1)(h) also requires that the DEQ promulgate rules to implement MCL 324.5505, which is related to "source, process, or process equipment," and MCL 324.5506, which relates to operating permits. A review of MCL 324.5512 is relevant because it demonstrates that when the Legislature intends to mandate that the DEQ promulgate rules, it clearly says so. We also find persuasive the DEQ's position that when MCL 324.5503(c) states that the DEQ shall act "[i]n accordance with" the Part 55 rules, it means that the DEQ must act in agreement or conformity with the applicable rules that already have been promulgated—it does not create a duty on the part of the DEQ to promulgate rules.

Additionally, the language of MCL 324.5503(c) clearly evidences that the Legislature intended that the DEQ possess the power to modify permits for cause. The DEQ's failure to promulgate rules specifically addressing the manner in which a permit may be modified does not nullify the legislative expectation that, when warranted, modification is permissible. See e.g., *Pub Health Dep't v Rivergate Manor*, 452 Mich 495, 504; 550 NW2d 515 (1996). Furthermore, this interpretation is consistent with the recognition that "a public agency acting in the public interest" has "both a duty and a right to correct [its own] error[s]." *Walter Toebe & Co v Dep't of State Hwys*, 144 Mich App 21, 34; 373 NW2d 233 (1985). Consequently, we find no merit to the proposition that the issuance of PTI 182-05C was not authorized by law because the DEQ failed to promulgate rules related to the modification of an existing permit.

Next, South Dearborn asserts that the DEQ failed to comply with rules it promulgated regarding permits to install. Specifically, the DEQ points to Mich Admin Code, R 336.1201(7) and (8). Rule 336.1201(7)(b) requires that, "[w]ithin 12 months after completion of the installation" authorized by a permit to install, "the person to whom the permit was issued . . . shall notify the department, in writing, of the status of compliance of the process or process equipment with the terms and conditions of the permit to install." Rule 336.1201(8) further provides that, "[i]f evidence indicates that the process or process equipment is not performing in accordance with the terms and conditions of the permit to install, the department . . . may revoke the permit to install" after the completion of certain procedures. However, "[r]evocation of a permit to install is without prejudice and a person may file a new application for a permit to install that addresses the reasons for the revocation." Rule 336.1201(8). South Dearborn contends that the DEQ's decision to issue PTI 182-05C was arbitrary, capricious, and an abuse of discretion because it did not revoke PTI 182-05B after learning of emissions testing discrepancies. We disagree.

It is clear, based on the plain language of the rules, that a decision to revoke an existing permit was within the DEQ's discretion. Indeed, the use of the word "may" demonstrates that revocation was not mandatory. See *Walters v Nadell*, 481 Mich 377, 383; 751 NW2d 431 (2008). Furthermore, the record does not support South Dearborn's conclusion that the DEQ's actions in this regard were arbitrary and capricious. In documents related to PTI 182-05C, the DEQ explained:

As required in PTI 182-05B, Severstal performed emissions testing. A majority of the test results indicated compliance with PTI 182-05B limits. However, in some cases the results of the emissions testing identified that emission factors used in the development of emission limits did not accurately reflect the emissions associated with Severstal's operations. Although the emissions factors were based on the best available data at the time, that data was limited, incomplete and, as the current emission test data have revealed, not as representative of Severstal's operations as anticipated. As a result, Severstal completed a series of technical reviews to determine whether any feasible control technologies or changes in raw materials are available that would enable them to achieve compliance with the emission limits. Based on the results of the technology evaluations, the [DEQ] determined that certain emission limitations should be updated. Of note, Severstal also completed additional stack testing during the review of this application, some of those test results have been used to derive emission factors. [Footnote omitted.]

After the DEQ was informed of the results of the emissions testing, a process ensued to determine the proper course of action. At the conclusion of this process, the DEQ exercised its discretion and elected not to pursue revocation of PTI 182-05B. Instead, it opted to update the emission limitations by modifying the permit. It would be a stretch to conclude that the DEQ's decision to consider an application to amend the prior permit rather than revoke an earlier permit was arbitrary and capricious under the circumstances presented.

South Dearborn further argues that the DEQ was required to deny the permit application under Mich Admin Code, R 336.1207(1). At the time in question, Rule 336.1207 provided, in pertinent part:

(1) The department shall deny an application for a permit to install if, *in the judgment of the department*, any of the following conditions exist:

(a) The equipment for which the permit is sought will not operate in compliance with the rules of the department or state law.

(b) Operation of the equipment for which the permit is sought will interfere with the attainment or maintenance of the air quality standard for any air contaminant.

(c) The equipment for which the permit is sought will violate the applicable requirements of the clean air act . . . .

(d) Sufficient information has not been submitted by the applicant to enable the department to make reasonable judgments as required by subdivisions (a) to (c) of this subrule. [Emphasis added.]

Initially, it should be recognized that based on the plain language of the rule, the decision to deny a permit under Rule 336.1207(1) was entirely within the DEQ's discretion. This is evidenced by inclusion of the phrase "in the judgment of the department." In this case, the DEQ assessed the air quality standards when issuing the permit and, in its judgment, determined that the permit was

appropriate. Without totally invading the province and expertise of the DEQ, which would be inappropriate, we cannot conclude that the issuance of PTI 182-05C was unauthorized by law. See *Dep't of Comm Health v Anderson*, 299 Mich App 591, 598; 830 NW2d 814 (2013) (noting that "an appellate court must generally defer to an agency's administrative expertise").

Next, South Dearborn addresses the applicability of Rule 336.1207 on two fronts. First, it argues that the permit application should have been denied under Rule 336.1207(1)(b). This rule prohibits the DEQ from issuing a permit when "[o]peration of the equipment for which the permit is sought will interfere with the attainment or maintenance of the air quality standard for any air contaminant." Rule 336.1207(1)(b).

South Dearborn asserts that the DEQ was required to deny the permit if the equipment governed by the permit would interfere with attainment of the 1-hour $SO_2$ National Ambient Air Quality Standard (NAAQS). South Dearborn contends that the new permit allows the steel mill to emit up to 1,199 tons of $SO_2$, far in excess of the EPA's "Significant Emissions Rate" for $SO_2$ of 40 tons per year. South Dearborn asserts that the DEQ never explained how it could make a finding that the emissions from the plant would not interfere with attainment of the 1-hour $SO_2$ NAAQS when it specifically chose to evaluate the permit as if the area was already in attainment with that standard. South Dearborn asserts that the DEQ's decision-making was, therefore, arbitrary and capricious. We disagree.

By its plain language, Rule 336.1207(1)(b) applies to permit applications related to the "[o]peration of the equipment for which the permit is sought[.]" In this case, the PTI 182-05C application did not seek to make any physical changes, changes to the method of operation, or increases in production rate/throughput for the equipment in the facility. That process had already been addressed by PTI 182-05B. Moreover, as already stated, Rule 336.1207 defers to the DEQ's judgment regarding whether the operation of the equipment for which the permit was sought would interfere with the attainment or maintenance of the air quality standard for any air contaminant. Clearly, the DEQ made this determination when it issued PTI 182-05B. In addition, the DEQ also contemplated the following:

> The 1-hour $SO_2$ NAAQS standard did not exist at the time of the 182-05B application; therefore, an analysis was conducted to determine if the revised emission could potentially affect the maximum 1-hour $SO_2$ concentration near Severstal. The current permitted emissions were modeled, along with the requested changes. Modeling showed that the revised $SO_2$ emissions from the "C" Blast Furnace Casthouse Baghouse stack and stove stack will not result in an increase of the maximum 1-hour $SO_2$ impacts.

Considering the foregoing, we are not persuaded that Rule 336.1207(1)(b) rendered the issuance of PTI 182-05C unauthorized by law.

In a related argument, South Dearborn argues that the DEQ's issuance of PTI 182-05C also violated the provisions of Rule 336.1206 in conjunction with Rule 336.1207(1) and that Severstal entered into an impermissible agreement with the DEQ to circumvent the rules. As indicated earlier, Rule 336.1207(1) mandates that the DEQ deny a permit to install under certain enumerated circumstances. In addition, at the relevant time, Rule 336.1206 required the DEQ to act on a permit

to install application within 120 days of finding it administratively complete. According to South Dearborn, a series of events unfolded that resulted in the parties avoiding the implications of Rules 336.1206 and 336.1207.

As represented by South Dearborn, the DEQ determined that Severstal's permit application was complete on April 6, 2012. Thereafter, the DEQ issued a series of violation notices regarding the pollution control equipment. Because of these violations, the DEQ initially concluded that Rule 336.1207 would have prohibited the agency from granting a new permit to Severstal. The DEQ notified Severstal that the company would have to withdraw its permit application, bring the equipment into compliance, and then submit a new application. According to South Dearborn, however, Severstal was reluctant to withdraw the application because it believed that it would be ineligible for the grandfathering that it sought. Further, Severstal recognized that it would take more than 120 days to bring the steel mill into compliance. According to South Dearborn, Severstal then proposed to enter into an extension agreement with the DEQ that would provide Severstal with additional time to rectify conditions and to comply with the Rule 336.1206 deadline. According to South Dearborn, the DEQ was initially reluctant to enter into such an agreement because the application was technically complete and it was therefore obligated to act upon it and, as mandated by Rule 336.1207, deny the application. South Dearborn represents that Severstal was able to enlist the help of then-Governor Snyder and the then-director of the Michigan Economic Development Corporation (MEDC). After a series of meetings between the MEDC, the DEQ, and Severstal, the DEQ agreed to an extension agreement, which it entered into on February 1, 2013. The agreement provided that the DEQ would make a final decision on the permit 150 days after it re-determined Severstal's application to be complete, or 120 days after Severstal provided supplemental information that might be requested by the DEQ. The agreement apparently was extended to require a final decision by May 9, 2014.

South Dearborn argues that the DEQ's agreement with Severstal not only circumvented the application of Rules 336.1206 and 336.1207, but it was also outside the DEQ's authority to enter into the agreement and, indeed, such an agreement violated the DEQ's own rules. We disagree and conclude that the DEQ was permitted to enter into the extension agreement under Mich Admin Code, R 336.1203. Rule 336.1203 addresses the information that must be included in an application for a permit to install. In relevant part, this includes, among other things, "a complete description . . . of each emission unit or process covered by the application," a description of any applicable air pollution control regulations, a description of "all air contaminants that are reasonably anticipated," and a description of how the applicant intended to control or minimize those contaminants. Rule 336.1203(1)(a) through (d). In addition, Rule 336.1203(2) allows the DEQ to request additional information from the applicant: "The department may require additional information necessary to evaluate or take action on the application." The extension agreement was the avenue by which the DEQ could exercise its authority under Rule 336.1203, while remaining within the time parameters of Rule 336.1206.

In an effort to avoid this conclusion, South Dearborn notes that Rule 336.1206 was amended in October 2013 to specifically allow the DEQ to extend the processing period beyond the applicable time limits if requested by the permit applicant. South Dearborn reasons that this rule change further confirms the ultra vires nature of the February 2013 extension agreement. Put another way, South Dearborn contends that the right to enter into extension agreements did not exist until the October 2013 amendment to Rule 336.1206.

Contrary to South Dearborn's assertions, however, the codification of a right to enter into an extension does not necessarily mean that the right did not exist before the promulgation of the rule. Indeed, considering the provisions of Rule 336.1203, it is more reasonable and sounder to conclude that the right to enter into extensions existed before October 2013. In *Avenal*, 762 F3d at 981, the court noted the following:

> Although Petitioners suggest that EPA must deny a Permit application if it cannot perform the required review within the one-year limit, that does not appear to have been the agency's only option. Even after the deadline passes, at least absent suit, EPA could presumably work with the applicant to ensure compliance with whatever regulations are in effect, and then issue or deny a Permit accordingly. [Footnote omitted.]

Additionally, by analogy, common law is frequently codified by subsequent legislation. See, e.g., *Zaher v Miotke*, 300 Mich App 132, 142; 832 NW2d 266 (2013). We are persuaded that the October 2013 amendments to Rule 336.1203 specifically allowed for the exercising of rights that previously existed, albeit informally. Accordingly, we find no merit to South Dearborn's assertion that, because no written rule allowed the DEQ to extend the time limit provided by Rule 336.1206 in February 2013, the agency' procedures were therefore unlawful and the DEQ exceeded its authority by doing so.

Finally, South Dearborn asserts that even with the extension agreement, the DEQ violated Rule 336.1207 when it issued the permit because it did not consider multiple violations identified just weeks before the permit was issued. However, the record does not support South Dearborn's contention that the DEQ did not consider the notice of violations. Furthermore, after considering the violations, the DEQ, in its discretion, still determined that issuing PTI 182-05C was appropriate.

Initially, we note that, according to the DEQ, the April 2014 notice of violations pertained to violations that allegedly occurred in 2013. Moreover, the DEQ did not ignore them as South Dearborn asserts. The extension agreement required Severstal to address the violations, which included providing an updated Operation and Maintenance Plan and a Malfunction Abatement Plan. Thus, not only did the DEQ not ignore the violations, it actually addressed the violations in the extension agreement. Furthermore, the notice of violations was simply the initiation of the process to confirm an actual violation. See *Luminant Generation Co v US Environmental Protection Agency*, 757 F3d 439, 442-442 (CA 5, 2014); *WildEarth Guardians v US Environmental Protection Agency*, 728 F3d 1075, 1083 (CA 10, 2013). The DEQ clearly determined that the installed equipment had the ability to achieve compliance. Considering this finding, the notice of violations did not mandate the denial of the PTI 182-05C application. Consequently, the DEQ exercised its judgment and was not required to deny the permit under Rule 336.1207. Accordingly, there has been no showing that the DEQ's actions were not authorized by law.

South Dearborn also asserts that the manner in which the DEQ considered the emissions from B Blast Furnace rendered the decision to issue PTI 182-05C an action unauthorized by law. It is undisputed that, when the DEQ issued PTI 182-05B in 2007, the permit allowed for the installation of a baghouse on B Blast Furnace. However, before Severstal could comply and install

the baghouse, B Blast Furnace was damaged and rendered inoperable on January 5, 2008. Nonetheless, the permit application at issue in this appeal proposed changes to the allowed emissions from both B Blast Furnace and C Blast Furnace. South Dearborn takes issue with the manner in which the DEQ treated B Blast Furnace when it issued PTI 182-05C in 2014. Specifically, South Dearborn contends that the permit unlawfully re-authorized the future reconstruction of B Blast Furnace without a new permit. Further, according to South Dearborn, the manner in which the DEQ considered the emissions from B Blast Furnace camouflaged significant emission increases from C Blast Furnace that would have otherwise required compliance with current standards and rules. Put another way, according to South Dearborn, the fictionally-installed baghouse on B Blast Furnace was used to offset emission increases for C Blast Furnace. South Dearborn asserts that the DEQ lacked the authority to issue a new permit to install six years after the destruction of B Blast Furnace. It contends that, if and when AK Steel ever decides to rebuild the blast furnace, the decision must be the subject of a new permit application under the DEQ rules and standards. It further contends that the DEQ's issuance of PTI 182-05C violated emission netting rules. Accordingly, South Dearborn contends that the issuance of the permit was not authorized by law.

The resolution of this issue requires a review of the development of the permits in this case and the underlying purpose of PTI 182-05C. As explained in the fact sheet, which is part of the public participation documents, the steel facility's operations included two blast furnaces: C Blast Furnace, which was operational, and B Blast Furnace, which was "currently down for repairs[.]" The permit in dispute is part of a series of permits related to these blast furnaces and other emitting equipment. The fact sheet explained the evolution of the permits:

> On January 31, 2006, Severstal was issued PTI No. 182-05, which authorized several modifications to enhance C Blast Furnace, including the addition of pulverized coal injection capability and increased hot metal production, as well as the installation of a baghouse for the casthouse and low-$NO_x$ technology on the furnace stoves. Also included in the PTI, was the contemporaneous installation of a secondary emission control baghouse at the BOF [basic oxygen furnace] to control charging and tapping emissions and low-$NO_x$ technology on the B Blast Furnace Stoves. *Subsequent revisions to the PTI were approved on July 6, 2006, (182-05A) and April 19, 2007, (182-05B) to incorporate updates and revisions to the original permit application based on detailed design and engineering information and included the addition of an on-site coal pulverization facility, installation of a baghouse on B Blast Furnace casthouse, and the installation of a hood to route the emission from the North Reladling to the BOF secondary emission control baghouse. Note that the coal pulverization facility has not been installed. The coal is pulverized off-site by a vendor and delivered already pulverized to an on-site silo.* [Emphasis added.]

The permit at issue in this case was part of a series and its intended purpose was to change emission allowances from the furnaces and other associated equipment:

> The permit application is for the proposed changes to the allowed emissions from the B and C Blast Furnace Operation and other associated equipment. It is also to install low nitrogen oxide ($NO_x$) technology on the B stoves. There will not

-14-

be any physical changes, changes to the method of operation, or increase in annual production rate/throughput for the equipment at the stationary source beyond what was approved in current PTI 182-05B.

Considering the scope and the purpose of PTI 182-05C, it would seem appropriate—even required—to evaluate the permit application under the circumstances that existed at the time PTI 182-05B was issued. The purpose of PTI 182-05C was to correct the implications of erroneous emission assumptions from PTI 182-05B. The proposed changes did not authorize any new construction or changes in the manner of operation. Accordingly, when evaluating PTI 182-05C, it is logical to consider the conditions that existed in 2007 when PTI 182-05B was issued, including the operation of B Blast Furnace. South Dearborn's arguments are premised on issues that were resolved by the issuance of PTI 182-05B, yet there is no indication that South Dearborn challenged the issuance of that permit. It cannot be allowed to do so under the guise of challenging PTI 182-05C.

In sum, we agree with the circuit court that the DEQ's decision to issue PTI 182-05C was authorized by law. The DEQ exercised its authority to issue the permit, and there is no indication that the DEQ's decision violated a statute or resulted from procedures that were unlawful. Regarding whether the decision was arbitrary and capricious, the DEQ issued its decision after detailed study and a period of public comment and hearing. In light of this Court's limited scope of review, we cannot say that this decision was not authorized by law. Accordingly, the circuit court did not err when it affirmed the DEQ's decision.

Affirmed.

/s/ Thomas C. Cameron
/s/ Jonathan Tukel
/s/ Kathleen Jansen